[Cite as *State v. Crump*, 2025-Ohio-2962.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
MAHONING COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

BRANDON LEE CRUMP, JR.,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
Case No. 24 MA 0086

---

Criminal Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 2021 CR 00102

**BEFORE:**
Cheryl L. Waite, Mark A. Hanni, Katelyn Dickey, Judges.

---

**JUDGMENT:**
Convictions Affirmed.
Sentence Vacated in part and Remanded.

---

*Atty. Dave Yost*, Ohio Attorney General, and *Atty. Drew E. Wood*, Senior Assistant Attorney General, for Plaintiff-Appellee

*Atty. Rhys Brendan Cartwright-Jones*, for Defendant-Appellant

Dated: August 18, 2025

---

---

**WAITE, J.**

{¶1} Appellant Brandon Lee Crump, Jr. appeals an August 21, 2024 judgment entry of the Mahoning County Court of Common Pleas convicting him of several charges stemming from a fatal shooting that occurred during a home invasion. Appellant challenges several aspects of his conspiracy charge, arguing both that it was insufficiently described within his indictment and that the state failed to introduce sufficient evidence to support his conviction. He challenges the admission of evidence in the form of photographs he calls gruesome, and evidence from an unrelated shooting. He also argues that his convictions are against the manifest weight of the evidence. Finally, he argues that the trial court failed to take mitigating evidence into consideration when imposing his sentence. Appellant's arguments are without merit and his convictions are affirmed. However, and for different reasons than raised by counsel, Appellant's sentence is remanded to the trial court solely for the purpose of merging his conspiracy conviction with his aggravated robbery and aggravated burglary convictions.

Factual and Procedural History

{¶2} This matter stems from an armed home invasion which ended with the death of a four-year-old child ("the Child") and injuries to four adult victims, including the Child's mother ("Mother"). At some time before the incident, Mother invited her longtime friend ("Friend") to her home, specifically for an evening of drinking and to consume drugs. Mother's boyfriend ("Boyfriend") and Friend's boyfriend, Andre McCoy (a co-defendant), were also present. Prior to the arrival of her guests, Mother picked up the Child from her mother's house, returning to her own home sometime around midnight. The Child fell asleep on a couch, with his head on a pillow and his body across Mother's lap.

{¶3} Mother's Friend and McCoy stopped to obtain drugs before going to Mother's house. During this stop, Friend noticed that McCoy was speaking with Kimonie Bryant, a friend of McCoy's. When Friend and McCoy arrived at Mother's house, they parked her vehicle on the street in front of the house.

{¶4} Shortly after Friend and McCoy arrived, the four adults began drinking and taking drugs. Mother sat on a grey couch pushed against one wall with the Child asleep on her lap. Friend sat next to her on the couch. Boyfriend sat on a leather couch on the opposing wall with McCoy next to him. At some point, Boyfriend pulled out $5,000 in cash to pay McCoy for drugs. Boyfriend had received the money as a result of COVID 19 unemployment compensation. Mother was uneasy with Boyfriend revealing he had such a large amount of cash, which he left on a coffee table after paying McCoy a relatively small amount of that money. However, she did not voice her concerns to Boyfriend at the time.

{¶5} Mother noticed McCoy and Friend were texting throughout the night and were not communicating with her or Boyfriend. She thought this behavior was odd, but was not overly concerned with it at the time. Phone records reveal that just before 1:00 a.m., McCoy texted Friend as follows.

McCoy: im finna take his shit

[Friend}: wym

[Friend]: so I know what to expect

McCoy: his money

[Friend]:  how

[Friend]:  ?

[Friend]:  cuddi

[Friend]:  answer me

McCoy:  nun im not

[Friend]:  why'd u wana take it?  [sic passim].

(State Exh. 184, pp. 8-10.)

{¶6}   At trial, McCoy explained that the first several lines of this text exchange relates to his intent to steal Boyfriend's money.  He stated that he did not immediately respond to Friend because he was also texting Bryant and orchestrating a plan for Bryant to come to the house and steal the money, which the two men planned would later be split equally.  While McCoy testified that the latter portion of the text showed his intent to abandon his robbery plan, he conceded that he never called off the plan with Bryant.  He also said there was never any discussion between the two men to include a third person into the plan.

{¶7}   Texts between McCoy and Bryant confirm that the two men were also texting one another regarding their robbery plans during this timeframe:

Bryant:  Sure he ain't got one

McCoy:  positive just told me how somebody stole it

Bryant:  Yo girl car right in front

McCoy:  yea

McCoy:  come up steps open door [sic passim].

(State's Exh. 188.)

{¶8}    At trial, McCoy clarified the meaning of these texts and confirmed that Bryant had asked whether Mother's Boyfriend had a gun.  McCoy responded that Boyfriend had just told him someone had stolen his gun.  The second part of the text was an effort to assist Bryant in finding the correct house by noting the location of Friend's car, and describing how Bryant should enter the house.  This text exchange began at 1:46 a.m.

{¶9}    In the meantime, Appellant became involved in the scheme.  Moments after the text exchange between McCoy and Bryant, Appellant emerged through Mother's front door, armed with a gun that he pointed at the group.  While Mother and Friend later struggled to identify Appellant in various photo lineups, McCoy testified at trial that he personally knew Appellant, and the gunman was Appellant.  Appellant's involvement surprised McCoy, as he had expected Bryant to enter the house and did not know Appellant had become involved.  After entering, Appellant demanded: "give me all your shit."  (Trial Tr., p. 1191.)

{¶10}  Despite McCoy's admitted involvement, Appellant fired first at him, shooting McCoy in the face.  McCoy dropped to the leather couch.  Appellant then turned to Boyfriend and fired several rounds, striking him in the abdomen, left scapular region, left upper back, and left gluteal region.

{¶11} Just before Appellant shot Boyfriend, Boyfriend yelled for Mother to run. Apparently this caused Appellant to notice Mother. Mother testified that she begged Appellant to spare the Child as she attempted to shield the Child with her body. Appellant responded, "shut the fuck up, dumb bitch," then put the gun to the Child's head and fired several rounds, killing him instantly. (Trial Tr., p. 1094.) Mother was also shot as she tried to protect the Child. Appellant then turned his gun on Friend and shot her in the left ankle, foot, and left shoulder. Friend waited until the gunman left before phoning 911. Officers were dispatched at 1:52 a.m.

{¶12} A neighbor ran over to the house after hearing gunshots and screaming. The neighbor assisted the injured parties until first responders arrived. The first responders immediately determined that the Child was dead. Mother, Friend, McCoy, and Boyfriend were taken to the hospital by ambulance, with McCoy and Boyfriend in critical condition. McCoy was placed in an induced coma and sent to an ICU unit. Mother and Friend were thought to be in stable condition, but it was later determined that Mother had a bullet lodged near the apex of her heart and she was also sent to the ICU. Each of the adult victims, however, survived the shooting. We note that Boyfriend died as a result of an unrelated shooting approximately a year after this incident.

{¶13} After the shooting, Mother immediately suspected McCoy and Friend played a role in the incident due to their odd behavior that night. She initially had difficulty identifying the shooter, but described him to police as a young, black male wearing a red jacket with a black hoodie underneath. (Trial Tr., p. 1095.) While his hood was pulled over his head, it did not cover his face. Contrary to Appellant's assertion at oral argument, the witnesses clearly testified that the shooter did not wear a mask. While Mother

struggled to identify the shooter in photo arrays, someone showed her a photograph of Appellant at a birthday party two weeks after the incident and she "had a really hard emotional reaction. [She] just knew that after seeing his face that that was the one who shot [her] and killed [the Child]." (Trial Tr., p. 1103.)

{¶14} Friend initially identified Bryant as the shooter. She testified that she immediately knew McCoy was involved, but did not tell police, as she was conflicted about her feelings towards him after the home invasion and shooting. She admitted to police that she deleted texts from McCoy in order to protect him. However, she later terminated their relationship because of his involvement in the shooting. She testified that she did not recognize the shooter at the time, and only identified Bryant because she knew who he was and felt pressured by police into making an identification. Hence, she identified Bryant from his photograph as the shooter, but knew he was not the gunman.

{¶15} The crime's timeline is essential to linking Appellant to the offense. There was no question that Bryant and McCoy were involved, but it was phone data that initially linked Appellant to the shooting. (Trial Tr., pp. 1697-1741; State's Exh. 235). Appellant resided in a house located on Dewey Avenue in Youngstown. Bryant lived on Cassius Avenue in Youngstown. Mother's house, where the shooting occurred, is on Perry Street in Struthers. The location of these properties formed a triangle, with Appellant's house at the lower western point, Mother at the lower eastern point, and Bryant at the top of the triangle.

{¶16} At 1:16 a.m., just sixteen minutes after the first text exchange between Bryant and McCoy, Appellant sent a Facebook message to an unknown woman named "Britt Britt" saying, "I can't find my keys or my gun." (Trial Tr., p. 1094.) Shortly thereafter,

Appellant's phone location is shown through cell phone towers travelling from the area of his residence (Dewey Avenue) to a cell phone tower near Bryant's house (Cassius Avenue). Most significantly, around 1:30 a.m., Appellant's and Bryant's phones were both pinging off towers forming a route from Cassius Avenue to Mother's house on Perry Street. Both phones ping off a tower near Mother's house around 1:40 a.m. and remained at that location for some time. Again, the text exchange where Bryant asked McCoy if Friend's vehicle was parked on the street occurred at 1:46 a.m. Thus, this evidence was used to show that both Bryant and Appellant were on the street near the front of Mother's house around the time this text exchange occurred.

{¶17} While the record does not contain the precise time of the shooting, Friend testified that she called 911 immediately after the shooter left, and officers were dispatched to the house at 1:52 a.m. Thus, the shooter left Mother's house very close in time to the dispatch call. Both Appellant's and Bryant's phones pinged off towers on a path moving away from Mother's house on Perry Street at 1:51 a.m. and heading back towards Cassius Avenue, Bryant's home. No further information about the cell phone location is available after they reach the area near Bryant's residence.

{¶18} During a search of the crime scene, investigators found several shell casings from the shooting. DNA testing on at least one of these casings excluded Bryant and McCoy, but included Appellant as a possible contributor. No other DNA (other than that of the victims') was found. Police were unable to recover the firearm used in the shooting.

{¶19} In the ensuing investigation, police obtained Appellant's cell phone records. Investigators discovered several videos of interest from his phone which appeared to be

taken shortly after the shooting. In the first, Appellant can be seen wearing a black hoodie with the hood pulled over his head, as described by the victims. In this video, Appellant holds a large sum of cash consistent with the amount that was taken from Boyfriend during the shooting. Two additional videos depict Appellant showing that same cash, in one removing it from a black bag (similar to a fanny pack) and in another, with his hands fanning the money out on a surface of some kind.

{¶20} As a result, on March 25, 2021, Appellant and three codefendants were charged in a nineteen-count indictment. The original codefendants included Appellant, McCoy, LaShawn Annie Scott (Bryant's mother), and Odyessie Odessa Butler-Reed (Appellant's girlfriend and mother of his child). The charges against Scott and Butler-Reed involved tampering related offenses that occurred after the investigation began. Co-defendant Bryant was charged in a separate indictment. The charges against his co-defendants were later severed and Appellant was tried separately.

{¶21} As to Appellant, on November 23, 2022, the trial court filed a judgment entry in response to a motion to dismiss filed by defense counsel. The court determined that the bindover process was not properly followed, and dismissed all but counts fourteen and fifteen (unrelated to the instant case). The remaining counts were dismissed without prejudice with instructions that, in order to proceed, the state was required to refile the charges in juvenile court and follow the appropriate transfer process. Apparently the state cured its error, and the matter proceeded to the general division of the common pleas court where the state filed a superseding indictment against Appellant charging the following:

Count 1:  Aggravated murder (of the Child), an unclassified felony in violation of R.C. 2903.01(B) and R.C. 2929.02(A) with an attenuated firearm specification in violation of R.C. 2941.145(A).

Count 2:  Aggravated murder (of the Child), an unclassified felony in violation of R.C. 2903.01(B) and R.C. 2929.02(A) with an attenuated firearm specification in violation of R.C. 2941.145(A).

Count 3:  Aggravated murder (of the Child), an unclassified felony in violation of R.C. 2903.01(C) and R.C. 2929.02(A) with an attenuated firearm specification in violation of R.C. 2941.145(A).

Count 4:  Attempted murder (of McCoy), a felony of the first degree in violation of R.C. 2923.02, R.C. 2903.02(A), (D), R.C. 2929.02(B) with an attenuated three-year firearm specification in violation of R.C. 2941.145(A).

Count 5:  Attempted murder (of Boyfriend), a felony of the first degree in violation of R.C. 2923.02, R.C. 2903.02(A), (D), R.C. 2929.02(B) with an attenuated three-year firearm specification in violation of R.C. 2941.145(A).

Count 6: Attempted murder (of Mother), a felony of the first degree in violation of R.C. 2923.02, R.C. 2903.02(A), (D), R.C. 2929.02(B) with an attenuated three-year firearm specification in violation of R.C. 2941.145(A).

Count 7: Attempted murder (of Friend), a felony of the first degree in violation of R.C. 2923.02 (B), R.C. 2903.02(A), (D) with an attenuated three-year firearm specification in violation of R.C. 2941.145(A).

Count 8: Felonious assault (of McCoy), a felony of the second degree in violation of R.C. 2903.11(A), (D)(1)(a) with an attenuated three-year firearm specification in violation of R.C. 2941.145(A).

Count 9: Felonious assault (of Boyfriend), a felony of the second degree in violation of R.C. 2903.11(A), (D)(1)(a) with an attenuated three-year firearm specification in violation of R.C. 2941.145(A).

Count 10: Felonious assault (of Mother), a felony of the second degree in violation of R.C. 2903.11(A), (D)(1)(a) with an attenuated three-year firearm specification in violation of R.C. 2941.145(A).

Count 11: Felonious assault (of Friend), a felony of the second degree in violation of R.C. 2903.11(A), (D)(1)(a) with an attenuated three-year firearm specification in violation of R.C. 2941.145(A).

Count 12: Aggravated burglary, a felony of the first degree in violation of R.C. 2911.11(A)(2), (B) with an attenuated three-year firearm specification in violation of R.C. 2941.145(A).

Count 13: Aggravated robbery, a felony of the first degree in violation of R.C. 2911.11(A)(2), (B) with an attenuated three-year firearm specification in violation of R.C. 2941.145(A).

Count 14: Escape, a felony of the second degree in violation of R.C. 2921.34(A)(1), (C)(2)(a) with an attenuated three-year firearm specification in violation of R.C. 2941.145(A).

Count 15: Robbery, a felony of the second degree in violation of R.C. 2911.11(A)(2), (B) with an attenuated three-year firearm specification in violation of R.C. 2941.145(A).

Count 16: Conspiracy, a felony of the second degree in violation of R.C. 2923.01(A)(1), (2), (J)(2) with an attenuated three-year firearm specification in violation of R.C. 2941.145(A).

{¶22} Appellant's counsel filed a motion seeking to sever counts fourteen (escape) and fifteen (robbery), which the court sustained on February 2, 2024. While Appellant later pleaded guilty to these charges, that conviction is not relevant to the instant appeal and involved conduct that occurred at the jail after Appellant was arrested and initially charged in this matter.

{¶23} The remaining charges proceeded to a jury trial, where McCoy testified against Appellant. While Bryant proffered a statement implicating Appellant, it was not used in Appellant's trial. The jury returned a guilty verdict on all counts as charged.

Case No. 24 MA 0086

Appellant was ordered to serve a life sentence with an aggregate total of fifty-two to fifty-three and one-half years of incarceration before he is eligible for parole.

**{¶24}** Due to conflicts of interests within the Mahoning County Prosecutor's Office, the Ohio Attorney General's Office is representing the state. On January 22, 2025, this Court granted Appellant's motion to exceed the page limit for his brief. On December 5, 2024, this Court granted Appellant's request for a sixty-day extension in which to file his brief. Because this Court generally only permits extensions in twenty-day increments, we counted this as Appellant's first and second extensions. On the date the brief was due to be filed, Appellant requested and was granted an additional extension. The state filed for and was granted a single extension.

**{¶25}** We will address Appellant's assignments of error slightly out of order for ease of understanding.

<u>ASSIGNMENT OF ERROR NO. 1</u>

The trial court erred in admitting over 100 gruesome and repetitive photographs despite the stipulated cause of death, violating Evid.R. 403(A) and resulting in prejudice that the prosecution cannot prove harmless beyond a reasonable doubt.

**{¶26}** Unlike most appellate challenges to allegedly gruesome photographs, Appellant does not take issue with specific exhibits. As such, it is difficult to review his actual argument here. Problematically, a review of photographs alleged to be gruesome is highly fact dependent, and more than one-hundred photographs were admitted as evidence at trial. Appellant appears to, very generally, take aim at the emotional response

the photographs may have triggered within the jury, and argues that the uncontested cause of the Child's death made some of the photographs irrelevant. The only photographs with which he specifically takes issue include two photographs taken of the Child's body lying on the couch. A third photograph was also objected to at trial, and Appellant's objection was sustained by the trial court as to that specific photo.

**{¶27}** Noting the problem with Appellant's failure to specify which photographs he views as objectionable, the state notes that all but the two exhibits he specifically mentions now are subject to a plain error review. As to the photographs of the Child at the scene, the state contends the photographs were taken to show the scene as responders found it, a permissible reason to introduce a photograph into evidence.

**{¶28}** We begin our review by recognizing it was Appellant's duty to raise specific errors and develop corresponding arguments as to any alleged errors. It is insufficient for counsel to generally take issue with over one-hundred photographs, claiming that many are gruesome, and attempt to shift the burden to the Court to determine which of the voluminous photographs might be problematic. If Appellant asserts that some of the more than one hundred photographs were improperly admitted, he has the duty to direct this Court to those specific alleged errors. Hence, while the two photographs explicitly raised by Appellant will be specifically addressed, the remaining one-hundred plus photographs will not be individually described.

**{¶29}** "A trial court's decision that a photo satisfies the standard [for admission] is reviewable only for abuse of discretion." *State v. Hill*, 2024-Ohio-1543, ¶ 54 (7th Dist.), citing *State v. Ford*, 2019-Ohio-4539, ¶ 237; *State v. Vrabel*, 2003-Ohio-3193, ¶ 69.

**{¶30}** Our analysis begins with the relevant statutory law. Pursuant to Evid.R. 403(A): "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Appellant argues that this Court should remove the qualifier of "substantially" from our analysis, or omit it entirely, as does the standard in capital cases. However, we have previously held that the correct standard for admission of photographic evidence in a non-capital offense is found in Evid.R. 403(A). *See State v. Gonzalez,* 2008-Ohio-2749, ¶ 34 (7th Dist.). While appellate courts have, at times, used the wrong standard of review, Appellant himself concedes that his argument in this matter falls within the non-capital offense standard pursuant to Evid.R. 403(A). Thus, despite Appellant's urging, the photographs in this matter are not subjected to the heightened standard, as this is not a capital case. Additionally, all but two photographs (exhibits 41 and 43) are subject to only a plain-error analysis.

**{¶31}** Under Ohio law, "even a photo that satisfies the balancing test is inadmissible if it is repetitive or cumulative." *Gonzalez, supra,* citing *State v. Thompson*, 33 Ohio St.3d 1, 9 (1987). Absent gruesomeness or shock value, numerous photographs challenged simply due to their number will not result in prejudicial error. *State v. Diar*, 2008-Ohio-6266, ¶ 232.

**{¶32}** Beginning with those photographs properly objected to at trial, these photographs (exhibits 41 and 43) depict the deceased Child's body lying on the couch. While each of the living victims were transported to the hospital by ambulance prior to photographing the scene, the Child's body was left as investigators discovered it, pending the crime scene unit investigator's and coroner's arrival.

**{¶33}** Exhibit 41 shows the Child lying on the couch with his head resting on a blood-soaked pillow. The Child's head was lying on the pillow at the time he was shot, hence, the pillow is covered in blood. However, while unquestionably disturbing, the photo in and of itself does not rise to level of inadmissible evidence. Under Ohio law, "[p]hotographs showing bodies as discovered are admissible as probative." *State v. Hill*, 2024-Ohio-1543, ¶ 56 (7th Dist.), citing *State v. Sharpe*, 2023-Ohio-2570, ¶ 33 (7th Dist.); *State v. Trimble*, 2009-Ohio-2961, ¶ 135. Because the purpose of the photograph is proper under Ohio law and it is not overly gruesome, the court did not err in admitting it into evidence.

**{¶34}** Exhibit 43 shows the top of the Child's head where investigators discovered the two fatal gunshot wounds. The stated purpose of this photograph is to depict the fatal gunshot wounds. There is a plethora of caselaw, including from this district, holding that "[p]hotographs supporting testimony of cause of death are generally admissible." *Hill,* citing *Sharpe* at ¶ 48; *Trimble* at ¶ 154. Further, "photographs, even if gruesome, are admissible to give the jury an 'appreciation of the nature and circumstances of the crimes' and to show 'intent and the manner and circumstances of the victims' deaths.' " *Sharpe* at ¶ 47, citing *Trimble* at ¶ 134, 136. Here, the gunshots to the Child's head were the cause of his death. Photographs depicting those injuries are probative and, therefore, admissible.

**{¶35}** Exhibit 42 was excluded at trial because investigators had turned the Child's body in an attempt to locate additional injuries and to search for evidence underneath the body. Thus, it did not represent the scene as it was discovered by first responders. This exhibit was properly excluded and is not at issue on appeal.

**{¶36}** As to the remaining one-hundred plus photographs, these consist of crime scene photographs and autopsy photographs of the Child. As to the crime scene photographs, it is important to consider the scene in its entirety. As could be expected based on the nature of the shooting and the number of victims, the scene as a whole is quite disturbing. However, because the victims were either shot while sitting on a couch or fell on a couch after being shot, most of the visible blood is limited to these locations. As may be expected, the worst such areas of the house were the grey couch where the Child was shot and the leather couch where McCoy fell after being shot in the face. The remaining victims suffered much less serious injuries with lesser amounts of blood. While some amount of blood is obviously depicted within the photographs, each are admissible based on Ohio law and do not rise to a violation of the parameters of the evidence rules.

**{¶37}** As to the Child's autopsy photographs, the state withheld most of these due to its belief that admission of all of these photographs would be duplicative. The photos that were admitted show the various gunshot wounds, and the skull fractures caused by the gunshot wounds. Some also contain metal probes tracing the paths taken by the bullets from the entrance and exit wounds. We have held that similar photos were properly admitted in other cases. See *Sharpe, supra; Hill, supra.*

**{¶38}** While Appellant does not directly contend that the Child's photographs had more of an emotional impact on the jury due to his tender age, we note that Appellant addresses only photographs of the Child in his general argument, despite the fact that there were several photos of the other victims in this case, including photos of the victim who was shot in the face. These other victims were all adults. To this extent, we must note that photographs of deceased or injured children are treated no differently than those

of adults. *See Sharpe* at ¶ 39, citing *State v. Mammone*, 2014-Ohio-1942, ¶ 100. ("As to the photographs of the infant car seat and bloody clothing, the Supreme Court held that photographs of a three-year-old and five-year-old who had been stabbed in the throat while strapped into their car seats were admissible.")

**{¶39}** Additionally, we note Appellant argues that the Child's photographs were unnecessary given that the fact of, and cause of, death were uncontested. However, we recently rejected this argument in *Sharpe, supra.* In *Sharpe*, we explained:

This exact argument was rejected in [*State v.*] *Mammone*, [2014-Ohio-1942, ¶ 103]. Additionally, while Appellant may not have contested certain elements of the crime at trial, the state clearly has the burden of proving each and every element and no stipulation was entered in this case. Had the state not proven all of the elements of the murder charges, the argument on appeal likely would have been that the state failed to meet its burden of proving each element beyond a reasonable doubt.

*Id.* at ¶ 57.

**{¶40}** Appellant has specifically complained of two photos he claims should not have been admitted. He then raises a general complaint that many of the other photos should not have been admitted, either, but does not raise specific complaints as to the remainder of the photographic evidence. Because each of the photographs admitted into evidence appear to be probative and admissible, not only those specifically mentioned by Appellant but all of the others, there was no error in their admission. Appellant cannot

show plain error in admitting the bulk of these photos, and his first assignment of error is without merit and is overruled.

ASSIGNMENT OF ERROR NO. 4

The trial court erred in allowing in other acts evidence, particularly without a jury instruction to aid the jury in appropriately weighing other acts evidence.

**{¶41}** This issue concerns testimonial evidence admitted at trial regarding an unrelated murder, referred to as the "Ravenwood shooting." Appellant was connected to the Ravenwood shooting after a glove, shell casings, and gun found at that residence were determined to contain Appellant's DNA. Investigators in the instant case were able to match shell casings found at the Ravenwood scene to casings discovered at the instant scene, which also had Appellant's DNA.

**{¶42}** Appellant argues that the Ravenwood evidence amounts to "other acts" or "bad acts" evidence. He contends that he was prejudiced when the state painted a picture for the jury that he is a dangerous person who has access to weapons and has been involved in multiple shootings, thus increasing the chance the jury would convict him in this case. In a confused and confusing argument, Appellant stated at oral argument that if his conspiracy charge had been dismissed before trial because he claims the indictment was insufficient (addressed in another, later assignment), the jury would not have heard about his connections to Bryant or been presented with evidence obtained from the "Ravenwood shooting," because that evidence was only introduced as relevant to his conspiracy charge.

{¶43} The state responds that the trial court ruled the Ravenwood evidence is not "other acts" evidence for purposes of Evid.R. 404(B). Instead, the evidence is relevant in this matter because it was used to identify Appellant as the shooter here, by establishing his connection to a firearm capable of firing the shells found at the scene.

{¶44} At trial, the court was asked to rule on the admissibility of several items discovered at the unrelated Ravenwood shooting scene: (1) a gun, (2) .45 caliber shell casings that were fired from the same weapon used to commit the instant shooting, and (3) a glove that included Appellant's DNA profile as a match. The court considered admission of the evidence under two theories: first, whether the evidence was relevant, and second, whether it amounted to evidence of Appellant's prior "bad acts."

{¶45} The court ruled that the gun was inadmissible, as its prejudicial effect would outweigh any relevancy. It was not established that the gun from the Ravenwood shooting was the same gun used to commit the instant shootings. However, the court ruled the Ravenwood shell casings and glove were admissible. Expert testimony had revealed that the Ravenwood shell casings were fired from the same gun as the one in the instant case. Thus, the court found that regardless of whether the Ravenwood shell casings were fired there or merely dropped at the Ravenwood scene, they were relevant in this matter as there was a nexus between the two sets of shell casings. The court allowed evidence of the glove containing Appellant's DNA for the same reason.

{¶46} The definition of "relevant evidence" is found within Evid.R 401, which states " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

Case No. 24 MA 0086

**{¶47}** Evid.R. 402 describes the admissibility of relevant evidence:

All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by the Constitution of the State of Ohio, by statute enacted by the General Assembly not in conflict with a rule of the Supreme Court of Ohio, by these rules, or by other rules prescribed by the Supreme Court of Ohio. Evidence which is not relevant is not admissible.

**{¶48}** Evid.R. 403 serves to exclude certain relevant evidence under two delineated exceptions to Evid.R. 402:

(A) Exclusion Mandatory. Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.

(B) Exclusion Discretionary. Although relevant, evidence may be excluded if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence.

**{¶49}** Importantly, there is an exception in the applicable law that addresses the effect of any evidence that goes towards showing a person's character or their prior crimes, wrongs, or acts. Pursuant to Evid.R. 404(B):

(1) *Prohibited Uses*. Evidence of any other crime, wrong or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

(2) *Permitted Uses; Notice*. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. The proponent of evidence to be offered under this rule shall:

(a) provide reasonable notice of any such evidence the proponent intends to introduce at trial so that an opposing party may have a fair opportunity to meet it;

(b) articulate in the notice the permitted purpose for which the proponent intends to offer the evidence, and the reasoning that supports the purpose; and

(c) do so in writing in advance of trial, or in any form during trial if the court, for good cause, excuses lack of pretrial notice.

{¶50} "The admission of such [other acts] evidence lies within the broad discretion of the trial court, and a reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion that created material prejudice." *State v. Diar*, 2008-Ohio-6266, ¶ 66.

{¶51} The Ohio Supreme Court created a three-step analysis when reviewing the admissibility of a prior "bad act":

The first step is to consider whether the other acts evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. Evid.R. 401. The next step is to consider whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B). The third step is to consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice. See Evid.R 403.

*State v. Williams*, 2012-Ohio-5695, ¶ 20.

**{¶52}** While Appellant contends that had the court dismissed his conspiracy charge the Ravenwood evidence could not have been admitted, Appellant is incorrect. His conspiracy charge is irrelevant to this issue because contrary to Appellant's claims, the Ravenwood evidence is completely unrelated to his conspiracy charge. The conspiracy charge was based on electronic and in person conversations between Appellant, Bryant, and McCoy that involved their plan to commit a robbery and burglary. The Ravenwood evidence, however, was introduced to assist in establishing the identity of Appellant as the shooter in this case. Appellant placed the element of identity squarely at issue here, as he attacked identity throughout the proceedings. The contested Ravenwood evidence did not tie him to Bryant or McCoy and had nothing to do with electronic or in person conversations or their plan to commit these crimes. The sole purpose in introducing the Ravenwood evidence was to establish Appellant's identity as

the gunman in this case by establishing that he owned or possessed a .45 caliber firearm, which tended to support (although not conclusively as the murder weapon was never recovered), a finding that he was the person who shot these victims.

{¶53} Although not discussed by either party, a case arising from the First District is somewhat similar, *State v. Shelton,* 2018-Ohio-3895 (1st Dist.). In *Shelton,* the appellant faced charges stemming from an incident where he brutally attacked a man and stole the man's vehicle. *Id.* at ¶ 8. After the appellant became a person of interest to police, a search warrant was obtained for his apartment and the victim's vehicle. The search showed the apartment and vehicle were in a similar state of disarray, with similar items found in both places, including "Swisher Sweets" cigar wrappers, bullets, boxes of ammunition, personal items, and clothing worn by the attacker.

{¶54} At trial, the state sought to admit photographs of both searches. The defense objected on grounds that a firearm was not used to commit the crime at issue and any evidence of firearms would be highly prejudicial, as it may lead the factfinder to believe the defendant was a dangerous person with access to firearms. *Id.* at ¶ 27. On appeal, the First District held that the evidence did not constitute "bad acts" evidence. Instead, the evidence went towards the element of identity, which was a critical and contested issue at trial. The court's basis for admitting the photographs was that they connected him to the stolen vehicle, as the photographs taken of the apartment and the vehicle showed they were in a similar state. Both sets of photos contained the same ammunition, shell casings, and distinctive cigar wrappers strewn about in cluttered spaces. *Id.* at ¶ 30. Thus, the evidence was not introduced to show the defendant's bad

character, but was admissible as evidence going of identity pursuant to Evid.R. 404(B). *Id.*

**{¶55}** Appellant relies on *State v. Smith,* 2020-Ohio-4441. However, *Smith* is completely distinguishable from the instant matter. In *Smith,* the appellant was faced with rape charges pertaining to his young granddaughter. Prior to trial, the state filed notice that it intended to introduce two witnesses: the appellant's two daughters who were the child's aunts. These witnesses would testify that he committed the same sexual acts on them as children. In other words, they would testify that the appellant's conduct with them was the same conduct he was accused of committing in the case involving his granddaughter. *Id.* at ¶ 11.

**{¶56}** The issue on appeal was whether the similar conduct demonstrated a "common scheme" and the absence of mistake. The Ohio Supreme Court held that the incidents did not show a common scheme, as they were committed thirty years apart. We note that the court did hold that the evidence was relevant to the absence of a mistake, and that its probative value was not outweighed by prejudice. *Id.* at ¶ 50. Regardless, the matter is completely inapplicable to the matter at hand, as the identity of the perpetrator was never at issue.

**{¶57}** Appellant contested his identity as the shooter throughout these proceedings. The state responded to his efforts by linking possession of a firearm that was capable of firing the bullets that were found at the scene to Appellant. Evidence that goes towards identity is a permitted use as established by Evid.R. 404(B)(2). Because this evidence was introduced only to show that Appellant was the man who shot the victims in this case, the evidence was properly admitted. Contrary to Appellant's

Case No. 24 MA 0086

arguments, whether or not conspiracy formed a portion of the charges against Appellant has no bearing on the question of the admission of this evidence. The Ravenwood evidence is relevant to establishing Appellant as the shooter in the same way the photographs from the two searches were relevant in *Shelton.*

**{¶58}** To the extent that Appellant argues the trial court failed to provide a limiting instruction to the jury, the Ohio Supreme Court has held that a limiting instruction is only required where defense counsel requests such instruction. *State v. Hartman,* 2020-Ohio-4440, ¶ 67; *see also* Evid.R. 105. Not only did Appellant's counsel fail to request any instruction, but counsel informed the judge that there was no instruction that would satisfy him, because he objected to the admissibility of this evidence so vehemently. (Trial Tr., pp. 176.)

**{¶59}** In accordance with *Shelton,* the trial court did not err in admitting the Ravenwood evidence at trial. As such, Appellant's fourth assignment of error is without merit and is overruled.

## ASSIGNMENT OF ERROR NO. 5

The trial court erred in convicting Brandon Crump as the verdicts were against the manifest weight of the evidence, given the unreliable eyewitness testimony and the lack of credible, impartial witness accounts.

**{¶60}** We must initially note there are key differences between Appellant's arguments in his brief and at oral argument in this matter. In his brief, Appellant focuses on the speculative nature of the case against him, particularly taking issue with witness identification. He also argues that McCoy's testimony was tainted by his interest in

protecting his plea agreement. At oral argument, Appellant argued that the conspiracy evidence should not have been presented to the jury. He contends that without this evidence there was almost no evidence to support his convictions.

**{¶61}** Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." (Emphasis deleted.) *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). It is not a question of mathematics, but depends on the effect of the evidence in inducing belief. *Id.* Weight of the evidence involves the state's burden of persuasion. *Id.* at 390 (Cook, J. concurring). The appellate court reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. *State v. Lang*, 2011-Ohio-4215, ¶ 220, citing *Thompkins* at 387. This discretionary power of the appellate court to reverse a conviction is to be exercised only in the exceptional case in which the evidence weighs heavily against the conviction. *Id.*

**{¶62}** "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. Hunter*, 2011-Ohio-6524, ¶ 118, quoting *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. The trier of fact is in the best position to weigh the evidence and judge the witnesses' credibility by observing their gestures, voice inflections, and demeanor. *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). The jurors are free to believe some, all, or none of each witness' testimony and they may separate the credible parts of the testimony from the incredible parts. *State v. Barnhart*, 2010-Ohio-3282, ¶ 42 (7th Dist.), citing *State v.*

*Mastel*, 26 Ohio St.2d 170, 176 (1971). When there are two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, we will not choose which one is more credible. *State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125 (7th Dist.1999.).

**{¶63}** 98xThere is no question that much of the evidence against Appellant is circumstantial, however, it is voluminous and strong evidence. Regardless, "[c]ircumstantial evidence and direct evidence inherently possess the same probative value." *State v. Bellum,* 2024-Ohio-2742, ¶ 57 (7th Dist.), citing *In re Washington*, 81 Ohio St.3d 337, 340 (1998). In fact, "[e]vidence supporting the verdict may be found solely through circumstantial evidence." *State v. Smith*, 2008-Ohio-1670, ¶ 49 (7th Dist.).

**{¶64}** We note that Appellant repeats his earlier argument that there was a "spillover effect" of the jury hearing the conspiracy charge, which he claims leads to "evidence coming in that naturally would come in a conspiracy case but should not come in a case where the indictment was defective." During oral argument, Appellant urged that evidence linking him to Bryant and evidence of the Ravenwood shooting should have been excluded due to an alleged defect within the conspiracy charge.

**{¶65}** We have determined that the Ravenwood evidence had nothing to do with the conspiracy charge. The Ravenwood shooting was distinct from this case and Appellant's codefendants were not involved in that incident. There is no link between the Ravenwood evidence and the conspiracy charge in this matter.

**{¶66}** The record shows the evidence linking Appellant to Bryant also went towards the element of identity, and was not limited to the conspiracy. The evidence linking Appellant to Bryant involved cell phone tower pings that showed him traveling with

Bryant to and from the crime scene, and the Facebook message Appellant sent to a female friend seeking his gun and keys just before he traveled to Bryant's location.

{¶67} Appellant's involvement with this crime can be traced to shortly after McCoy and Bryant began texting and planning the robbery. McCoy and Bryant began texting around 1:00 a.m. Sixteen minutes later, Appellant sent a Facebook message to an unknown woman named "Britt Britt" saying, "I can't find my keys or my gun." (Trial Tr., p. 1094.).

{¶68} Around 1:30 a.m., approximately fourteen minutes after the Facebook message, Appellant's phone shows he was on a path from his residence on Dewey Avenue to Bryant's residence on Cassius Avenue, both in Youngstown. At 1:30 a.m., both phones were tracked from Cassius Avenue to Perry Street, where the shooting occurred. Both phones pinged off a cell tower on Perry Street at 1:40 a.m. The inference from this evidence is that Bryant and Appellant traveled together to Mother's house and discussed and developed their plans.

{¶69} Four minutes later, Bryant texted McCoy inquiring whether Boyfriend had a gun to defend himself and if Friend's car was parked in front of the house. At 1:46 a.m., McCoy answered, stating that Boyfriend did not have a gun and that Friend's car was indeed parked in front of the house. He also instructed Bryant on the best way to enter the house. Phone records of Appellant and Bryant show they did not leave the area until 1:51 a.m. Officers were dispatched to Mother's house at 1:52 a.m., one minute later.

{¶70} While this evidence is certainly relevant towards the conspiracy charge, it is also relevant because it tends to prove an element of all of the charged offenses: the identity of the shooter. In terms of the conspiracy charge, the Bryant evidence was

relevant to show that in-person conversations between Appellant and Bryant likely occurred when they traveled together to Mother's house just before the shooting.

{¶71} However, this evidence also is relevant to prove Appellant's identity as the shooter, as it showed him driving on a path directly to Mother's house immediately prior to the shooting with a person who, by everyone's account, was involved in planning and executing the incident. That evidence also shows Appellant left the area just as police were dispatched to the scene. Hence, this evidence is unquestionably relevant to establishing that Appellant was at the scene at the time of the incident and, as he was specifically looking for his gun, that he was the shooter.

{¶72} In addition, McCoy, who personally knew Appellant, identified him as the shooter. McCoy testified that he had expected Bryant to walk through the door, and was surprised to see Appellant enter the house:

Q  Who comes through that door?

A  Brandon Crump.

Q Brandon Crump?

A  Yes.

Q  You met Brandon Crump; right?

A  Yes.

Q  Do you know what he looks like?

A  Yes.

(Trial Tr., p. 1439.)

{¶73}  At oral argument, Appellant claimed the shooter wore a mask and it would be unreasonable for a jury to place significant weight on McCoy's identification for this reason.  However, the undisputed testimony of the victims was that the shooter did not wear a mask.  Instead, the victims described the shooter as wearing a black hoodie.  While with the hood was pulled over his head, it did not cover his face.  Further, any conjecture as to how much weight the jury placed on this identification is mere speculation.  It would certainly be reasonable for the jury to give this testimony great weight, as McCoy testified that he knew Appellant and recognized the man who shot him in the face as Appellant.

{¶74}  Appellant challenges McCoy's identification, claiming he had reason to lie due to his friendship with Bryant and because he entered into a plea agreement in his own case.  As to his friendship with Bryant, Appellant testified it ended as a result of this incident.  McCoy testified that not only was he the first person shot that night, but that Appellant shot him in the face, leaving him in critical condition and in the ICU.  McCoy stated he would not protect Bryant by falsely claiming someone else shot him even if Bryant had shot him in the face, as Appellant had.  McCoy also acknowledged at trial that he received a "deal," but was still serving a life sentence and would not be eligible for parole for at least fifteen years.  (Trial Tr., p. 1445.)  Also, as the state pointed out on cross, McCoy's deal was not just contingent on his providing truthful testimony against Appellant, but he was also required to testify against Bryant.  A reasonable factfinder

could decide McCoy did not misidentify Appellant as the gunman to protect his friendship with Bryant.

**{¶75}** There is additional evidence linking Appellant to the shooting. First, Appellant's DNA profile was on shell casings found at the scene. Bryant and McCoy's DNA profiles were excluded as a possible contributor of this DNA. While Appellant complained at oral argument that the statistics concerning his inclusion were on the lower end, he concedes that the jury heard evidence regarding these statistics. We have previously affirmed convictions based on a single piece of identifying evidence. *See State v. Ferrara*, 2015-Ohio-3822, (7th Dist.) (three thirty-nine-year-old fingerprints found near a garage door that was used to gain entrance into the victim's house were sufficient to support a conviction for murder.); *State v. Fuller*, 2016-Ohio-4796 (7th Dist.) (a single hair that matched the appellant's DNA profile and was found underneath the victim's body was sufficient to support a conviction in an aggravated murder case.); *State v. Boyd*, 2020-Ohio-812 (7th Dist.) (a single pill bottle removed by a robber with his fingerprint found on the bottle along the path of his flight was sufficient to support a conviction). Even more significantly, we recently held that where a jury is on notice of a low statistical likeliness involving DNA evidence, it is proper for the jury to rely on that evidence in weighing whether the state had proved the defendant was the shooter. *Sharpe* at ¶ 72. Whatever weight the jury chose to assign to the DNA evidence in this case, in addition to the speculative nature of Appellant's arguments, we must note that a jury does not review evidence in a vacuum. There is a plethora of relevant evidence in this matter that, when viewed as a whole, supports Appellant's guilt.

{¶76} Investigators found several videos on Appellant's phone which appear to have been taken shortly after the shooting. These videos depict Appellant wearing a black hoodie with the hood pulled up, as described by the victims. In these videos, he is holding a large sum of money in denominations consistent with the money stolen from Boyfriend. (Trial Tr., p. 2010.) Also, the stolen money was described as having the larger bills on top and the smaller bills on bottom, which is also consistent with the description of the money in the video.

{¶77} Finally, a video and a still shot of Appellant shows him seated in a vehicle displaying a "Springfield Armory XD-45ACP" firearm, which is a .45 caliber handgun. (Trial Tr. 1527.) Kevin Kramer, a forensic scientist in the firearm section at the Ohio Bureau of Criminal Investigation, testified that a Springfield Armory pistol was one of the firearms which could have fired the shots in this case. (Trial Tr., p. 1875.)

{¶78} This record contains an abundance of evidence establishing Appellant as the shooter. While Appellant challenges the credibility of certain witnesses and the value of some evidence, those determinations are reserved for the jury, and there is nothing of record to suggest that the jury lost its way. Accordingly, Appellant's fifth assignment of error is without merit and is overruled.

## ASSIGNMENT OF ERROR NO. 3

The trial court erred in denying the defense's Crim.R. 29 motion for acquittal on the conspiracy charge because the state failed to present sufficient evidence of Brandon Crump's involvement in the alleged conspiracy, including any agreement or overt act, as required by R.C. 2923.01.

{¶79} Appellant argues that the state failed to present sufficient evidence at trial to link him to a conspiracy. Namely, he contends that no evidence is found within the record to demonstrate that he completed any overt act in furtherance of the conspiracy.

{¶80} The state responds by discussing the evidence omitted from Appellant's argument. Significantly, Appellant's phone was tracked along a path that traversed the area between his home and Bryant's home. Both Appellant's phone and Bryant's phone were then tracked moving together, showing they were traveling together, and ended up in the location of Mother's house. The state urges that no written or oral evidence of communication between Appellant and Bryant was necessary, or logical, because they were sitting together while traveling to the crime.

{¶81} Regardless, as discussed at length within the prior assignments of error, there is a plethora of evidence in this record linking Appellant to the conspiracy. The state offered a Facebook message from Appellant to a woman named "Britt Britt" seeking her assistance in finding his gun and keys. Almost immediately after sending this message, cell phone records tracked Appellant travelling towards Bryant's known residence. Appellant and Bryant's phones were then tracked as they both drove to and remained near Mother's house for some time. Following the shooting and shortly after police were dispatched, phone records show them traveling towards Bryant's house again.

{¶82} While Appellant seems confused and appears to believe that if his conspiracy conviction is vacated the state has no proof of his involvement in the other crimes, Appellant is mistaken. Whether a conspiracy has been established and whether Appellant was the shooter are two wholly unrelated issues. Evidence Appellant erroneously believes would not have been admitted but for the conspiracy charge was, in

fact, completely admissible as evidence in all of the other charged crimes. As previously discussed, all of this evidence was identity evidence. Regardless, the state provided sufficient evidence to convict on this charge, and Appellant was not entitled to dismissal of his conspiracy charge. As such, Appellant's third assignment of error is without merit and is overruled.

ASSIGNMENT OF ERROR NO. 6

The trial court acted contrarily to law in sentencing Brandon Crump to a total term of 33 years to life by failing to adequately consider the mitigating factors detailed in the psychological report, including Crump's childhood trauma, mental health diagnoses, and potential for rehabilitation, as required under R.C. 2929.11 and R.C. 2929.12.

{¶83} Appellant challenges his sentence, here, but limits his argument to whether the trial court considered mitigating evidence contained in a psychological report. Appellant concedes that "the judge acknowledged [his] youth and difficult upbringing as mitigating factors." Despite this, Appellant contends that the court's consideration was inadequate.

{¶84} The state counters by suggesting that Appellant is merely unhappy with the way the court balanced the sentencing factors. The state points out Appellant concedes the sentence falls within the statutory range.

{¶85} The standard of review of a felony sentence is found within R.C. 2953.08(G)(2):

The court hearing an appeal under division (A), (B), or (C) of this section shall review the record, including the findings underlying the sentence or modification given by the sentencing court.

The appellate court may increase, reduce, or otherwise modify a sentence that is appealed under this section or may vacate the sentence and remand the matter to the sentencing court for resentencing. The appellate court's standard for review is not whether the sentencing court abused its discretion. The appellate court may take any action authorized by this division if it clearly and convincingly finds either of the following:

(a) That the record does not support the sentencing court's findings under division (B) or (D) of section 2929.13, division (B)(2)(e) or (C)(4) of section 2929.14, or division (I) of section 2929.20 of the Revised Code, whichever, if any, is relevant;

(b) That the sentence is otherwise contrary to law.

{¶86} When determining a sentence, a trial court must consider the purposes and principles of sentencing in accordance with R.C. 2929.11, the seriousness and recidivism factors within R.C. 2929.12, and the appropriate statutory range set forth within R.C. 2929.14.

{¶87} There is no dispute that the individual sentences imposed by the court are within the statutory range. Additionally, the court stated that it considered R.C. 2929.11 and R.C. 2929.12 at the sentencing hearing and within its sentencing entry.

Nevertheless, Appellant posits that the court failed to consider mitigating evidence in the form of a psychological report.

**{¶88}** We have held the record must affirmatively demonstrate some failure of the court to consider mitigating evidence in order for this to rise to the level of reversible error. *State v. Pedicini,* 2020-Ohio-3627, ¶ 23 (7th Dist.). We have also repeatedly held that "while mental health is a factor a trial court may consider when imposing a sentence, it is not the only factor for a court to consider." *State v. Whitfield,* 2022-Ohio-4819, ¶ 13 (7th Dist.). *See also State v. Consiglio*, 2022-Ohio-2340, ¶ 37 (7th Dist.); *State v. Linzey*, 2021-Ohio-1994, ¶ 27 (7th Dist.); *State v. Bishop*, 2019-Ohio-4963, ¶ 41 (7th Dist.).

**{¶89}** Appellant's argument centers on whether the court considered Appellant's psychological report when determining his sentence. While Appellant complains the report was not considered, the record clearly establishes otherwise. In relevant part, the court expressly stated at the sentencing hearing:

I've read the report from Dr. Alpert. It has partly been referenced today. Before that, I've also considered in relation to 2967.132, the mitigating factors that I must consider. The chronological age of [Appellant] at the time of the offense, including the intellectual capacity, immaturity, impetuosity, failure to appreciate the risk and consequences of his actions. The family and home environment of [Appellant] at the time of the offense, his inability to control their surroundings, a history of trauma, their schooling, special education requirements. The circumstances of the offense, including the extent of the person's participation, the conduct and the way the family and peer pressure may have impacted his actions that night.

Whether he may have been charged and convicted of a lesser offense if not for the matters associated with his youth, such as the person's inability to deal with police officers and prosecutors during interrogation and possible plea agreement. And also his rehabilitation, if any, including any subsequent growth and increase in maturity during imprisonment or confinement. That's been for three years now.

In looking at Dr. Alpert's report, it goes through -- and Attorney DeFabio touched upon it – [Appellant's] upbringing. The fact that he was essentially running the streets at 11, that he was abused, physically and sexually. That his mother had multiple contacts with Children Services, multiple contacts with law enforcement. His education, the issues and problems that he had while attending school. His history of -- with his father and his father being killed. His own child. His substance abuse history, alcohol, marijuana, hallucinogens, benzodiazepines, stimulants, nicotine. His own record, which was not severe, but I will touch on that later on. While he was incarcerated, his contact with the juvenile system, his involvement in the court's cognitive behavioral therapy program. His medical history, mental health history. The events that led up to the participation that night. The testing, the ACA questioning that was done. Testing, if you will, positive. Emotional abuse, physical abuse, sexual abuse, emotional neglect, physical neglect, parents separated and divorced, mother treated violently, substance abuse in the household, mental illness in the household, incarceration of a household member.

Case No. 24 MA 0086

The only one that was not on the chart was mental illness in the household, and I think that was overlooked. I think there probably was evidence that there was.

He was 111 days, I believe, short of his 18th birthday. He was as close to becoming an adult as you could be to commit such an offense though.

(Trial Tr., pp. 55-58.)

Having taken those into account, I acknowledge that [Appellant] has had a very difficult life. But I would submit that should not only be my concern in this matter with regard to what happened to him, but also what happened to the victims. I would submit that the issue is of equal concern as to what they went through at least as to what [Appellant] went through before that night.

(Sentencing Hrg. Tr., p. 60.) The trial court's discussion of this issue takes up more than three pages of the sentencing hearing transcripts.

**{¶90}** As noted by the trial court, in addition to mitigating evidence concerning the defendant, a court is required to consider evidence of aggravating factors and the harm done to the victim, and the victim's age. *See* R.C. 2929.12(B)(1).

**{¶91}** At the sentencing hearing, the state raised the evidence relating to the aggravating circumstances, here. Appellant responded to Mother's pleas to spare her four-year-old son who slept on her lap, by remarking "shut the fuck up, dumb bitch" before

firing at least six shots in total, four of which struck the child, including two shots to his head.  (Sentencing Hrg., p. 10.)  The state also raised Appellant's significant criminal history beginning as a twelve-year-old juvenile.  The state highlighted his lack of remorse by addressing Appellant's action in flaunting the money he stole from Boyfriend in three cell phone videos.  (Sentencing Hrg. Tr., p. 11.)  In addressing the psychological report the state reminded the court that, while it was required to consider that report, it was not obligated to reduce Appellant's sentence based solely on the report.  While the state acknowledged Appellant's difficult upbringing, it highlighted the fact that Appellant shot and killed a four-year-old who slept on his mother's lap, and shot four other people, just to steal $5,000.  (Sentencing Hrg. Tr., p. 13.)

{¶92}  Before pronouncing Appellant's sentence, the court took time to reflect on the difficult nature of the crime and that it was necessary to obtain a sense of the harm caused.  The court stated that although the child's death received the bulk of the attention, five people were shot and injured in an act so violent that "just one of them on its own would have been enough to make this incident horrendous all by itself." (Sentencing Hrg. Tr., p. 51.)  The court discussed the injuries suffered, victim by victim.  The court also stated that it considered Appellant's home life and his difficult upbringing, but noted that he was the shooter, not just a conspirator.

{¶93}  It is clear that the court considered the psychological report, but weighed its contents against the harm suffered by the victims and the violent nature of the shooting. Further, while a sentencing court must consider the perpetrator's mental health, it was not required to rely solely on its contents in sentencing.  The court clearly balanced the

contents of the report against the harm experienced by the victims, as permitted by law. As such, Appellant's sixth assignment of error is without merit and is overruled.

ASSIGNMENT OF ERROR NO. 2

The trial court erred in failing to dismiss the conspiracy charge because the indictment did not allege a substantial overt act as required by R.C. 2923.01(B), rendering the indictment legally insufficient.

**{¶94}** Appellant argues that the conspiracy count of his indictment merely tracks the language of the statute without identifying an overt act completed in furtherance of this conspiracy. Appellant does not develop the law or arguments regarding an overt act but does cite to cases discussing the required language.

**{¶95}** The state distinguishes the instant indictment from Appellant's cited cases, as it goes beyond simply parroting the language of the statute. The state points out the indictment states that Appellant communicated with specified persons both in person and electronically to "plan and execute" the use of force to steal the property of the occupants of a specific address.

**{¶96}** In Ohio, a person accused of a felony is "entitled to an indictment setting forth the 'nature and cause of the accusation' pursuant to Section 10, Article I of the Ohio Constitution." *State v. Parker*, 2015-Ohio-4101, ¶ 8 (7th Dist.), citing *State v. Sellards,* 17 Ohio St.3d 169, 170 (1985). "A criminal indictment serves several purposes. First, by identifying and defining the offenses of which the individual is accused, the indictment serves to protect the individual from future prosecutions for the same offense." *State v. Childs,* 2000-Ohio-298, 198, citing *Sellards* at 170. "In addition, the indictment compels

the government to aver all material facts constituting the essential elements of an offense, thus affording the accused adequate notice and an opportunity to defend." *Id.,* citing *Sellards* at 170.

**{¶97}** Where the charged offense is a conspiracy, the state must prove that "subsequent to each defendant's entrance into said conspiracy, a substantial overt act was done by each defendant or a person with whom they conspired; contrary to the form of the statute." *State v. Troisi*, 2022-Ohio-3582, citing *Childs,* former R.C. 2923.01(B). It is insufficient for an indictment to merely recite the statutory language regarding overt acts. *Id.*

**{¶98}** Because the adequacy of an indictment involves a question of law, a reviewing court reviews such arguments *de novo*. *State v. Johnson*, 2019-Ohio-1089, ¶ 40 (7th Dist.), citing *State v. Mason*, 2016-Ohio-8400, ¶ 17 (3d Dist.). However, Crim.R. 12(C)(2) provides that certain objections must be raised prior to trial, including "[d]efenses and objections based on defects in the indictment." Under Ohio law, "such error [is] waived absent plain error." *State v. Six,* 2023-Ohio-4361, ¶ 21 (3d Dist.), citing *State v. Jones*, 2013-Ohio-4775 (1st Dist.), *State v. Horner*, 2010-Ohio-3830.

**{¶99}** While the state indicates that an indictment may be attacked at any time, including on appeal, this is true only where the indictment is void as it fails to adequately charge any offense. *State v. Reinhart,* 2007-Ohio-2284, ¶ 11. The very next sentence of *Reinhart* provides that where an indictment is challenged as insufficient or vague, a timely objection must be raised or the defendant may have waived the issue on appeal. *Id.* Appellant now challenges only the sufficiency of this count in his indictment. As he

was required to object prior to trial in order to preserve the issue for appeal, we must determine the effect of his failure to timely object and whether plain error exists.

{¶100} A three-part test is employed to determine whether plain error exists. *State v. Billman*, 2013-Ohio-5774, ¶ 25 (7th Dist.), citing *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002).

> First, there must be an error, i.e. a deviation from a legal rule. Second, the error must be plain. To be "plain" within the meaning of Crim.R. 52(B), an error must be an "obvious" defect in the trial proceedings. Third, the error must have affected "substantial rights." We have interpreted this aspect of the rule to mean that the trial court's error must have affected the outcome of the trial.

*Billman* at ¶ 25.

{¶101} In this case, the conspiracy charge within the indictment states that Appellant and his named codefendants "communicated either in person and/or through electronic means to plan & execute" the commission of aggravated burglary and aggravated robbery. (6/22/23 Indictment.)

{¶102} Here, the state had knowledge that Appellant traveled with Bryant to Mother's house just before the shooting, but did not include this fact in the indictment. However, failure to include this specific information is not fatal.

{¶103} It is important to view the language of the indictment in the context of the entire document and the existing evidence. The evidence linking Appellant to Bryant involved cell phone tower pings that located him traveling to Bryant's house and traveling

with Bryant to the crime scene, along with the Facebook message that Appellant sent a female friend seeking his gun and keys just before he left for Bryant's house. The Facebook message Appellant sent in an effort to find his firearm is an electronic communication as referred to in the indictment and is an action taken in furtherance of the crime. Locating his firearm and keys were necessary actions in order to complete the crime. Also falling within the purview of electronic communications were the texts between McCoy and Bryant. While Appellant was not a party to those texts, it is apparent that he knew the plans contained in these communications, as he began preparing for the commission of the offense. Since the evidence leads to the obvious conclusion Appellant was inside a vehicle with Bryant traveling to the crime scene, he would undoubtedly have at least some knowledge of the text messages between McCoy and Bryant that were sent after Appellant and Bryant began their drive to Mother's house.

{¶104} In their briefs, the parties discuss *State v. Lambert,* 2017-Ohio-4310 (4th Dist.) However, *Lambert* is distinguishable from the instant matter, as that indictment included language literally repeating the statutory language and merely alleging the defendant "performed a substantial, overt act." *Id.* at ¶ 14. The instant indictment clearly does more than repeat the phrase "overt act."

{¶105} We emphasize that the state is required to simply show there was an overt act, not prove their case at this stage. While the conspiracy count of the indictment certainly could have been stronger and included specific information as to the codefendants traveling with one another to Mother's house, it is not insufficient to charge conspiracy. Appellant cannot complain he was unaware of the acts charged so as to be

unable to assert a defense, as he was informed about the offenses involved, the date and location of the offenses, the actions he took and with whom. No plain error exists, here.

{¶106} That said, we note, here, that this case involves the unusual situation where, regardless of the holding on this issue, Appellant derives no practical benefit. Had we determined the indictment was insufficient, while the matter would be remanded for the conspiracy conviction to be vacated, contrary to Appellant's arguments this would not affect the admission of any evidence that may have been relevant to the conspiracy charge, as that evidence was also admissible on the other charges pursuant to Evid.R. 404(B)(2). Hence, those charges would be unaffected. As we find the indictment was sufficient, while an issue regarding merger arises, this undoubtedly will not affect Appellant's sentence.

{¶107} Appellant was sentenced on both the aggravated robbery and aggravated burglary convictions which were the objectives of the conspiracy, and was sentenced on the conspiracy conviction. Count sixteen contains the conspiracy charge, which alleged a conspiracy to commit "aggravated burglary and/or aggravated robbery." Count twelve contains the aggravated burglary charge, and count thirteen describes the aggravated robbery charge. Appellant was convicted on all fourteen counts he faced at trial, including these three (again, two other charges were severed prior to trial).

{¶108} Although not raised by either party, R.C. 2923.01(G) provides: "[w]hen a person is convicted of committing or attempting to commit a specific offense or of complicity in the commission of or attempt to commit the specific offense, the person shall not be convicted of conspiracy involving the same offense." In other words, "R.C. 2923.01(G) merges the conspiracy offense, due to its inchoate nature, into the

substantive offenses which are the object of the conspiracy." *State v. Marian*, 62 Ohio St.2d 250, 255 (1980); citing *State v. Jones*, 2019-Ohio-301, ¶ 195 (6th Dist.).

{¶109} Hence, whether the indictment sufficiently charged conspiracy or did not, the matter must be remanded to the trial court to merge or vacate the conspiracy conviction. As we have found the indictment sufficient, merger is required. This will likely have no practical effect on Appellant's sentence, because the trial court ran the sentence ordered on the conspiracy conviction concurrently to Appellant's other sentences. Thus, it appears merger will not affect Appellant's sentence in any practical way, as Appellant will undoubtedly face the same term of incarceration.

{¶110} As this record reveals no plain error and the indictment was sufficient to charge conspiracy, we remand the matter to the trial court with instructions to merge or vacate the conspiracy conviction with his convictions for aggravated burglary and aggravated robbery for purposes of sentencing.

Conclusion

{¶111} Appellant challenges several aspects of his conspiracy charge, arguing both that it was insufficiently described within his indictment and that the state failed to introduce sufficient evidence to support his conviction. He challenges the admission of evidence in the form of allegedly gruesome photographs and evidence from an unrelated shooting. He also argues that his convictions are against the manifest weight of the evidence. Finally, he argues that the trial court failed to take mitigating evidence into consideration when imposing his sentence. Appellant's arguments are without merit and his convictions are affirmed. However, albeit for different reasons than raised by counsel, this matter is remanded to the trial court solely for purposes of merging his conspiracy

Case No. 24 MA 0086

conviction with the aggravated robbery and aggravated burglary convictions for sentencing purposes. This is the only matter to be addressed on remand. As we have affirmed all of Appellant's assignments regarding his convictions and the sole issue he raised as to sentencing, no other issues relating to Appellant's convictions or sentencing may be addressed on remand.

Hanni, J. concurs.

Dickey, J. concurs.

_____

For the reasons stated in the Opinion rendered herein, Appellant's assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is affirmed. However, Appellant's second assignment has partial merit and is sustained for reasons other than raised by Appellant. As such, this matter is remanded to the trial court for further proceedings according to law and consistent with this Court's Opinion. Costs waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

### NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**